[No. 8441.]

STEARNS-ROGERS MANUFACTURING COMPANY V. JACKSON LAKE RESERVOIR AND IRRIGATION COMPANY.

1. EVIDENCE—*Parol Admissible,* to aid in determining the understanding and intentions of the parties to a contract, the terms of which are obscure and indefinite. (407.)

2. CONTRACTS—*Construed.* Contract to furnish certain machinery for the cleaning of a ditch construed, in the light of parol evidence heard, to import that the plant furnished would be sufficient and effective to clean the ditch. (407, 408.)

*Error to Morgan District Court.* Hon. H. P. BURKE, Judge.

Messrs. HARTMAN & BALLREICH, for plaintiff in error.

Messrs. STEPHENSON & STEPHENSON, for defendant in error.

Mr. Justice BAILEY delivered the opinion of the court.

The defendant in error, plaintiff below, the Jackson Lake Reservoir and Irrigation Company, owned a reservoir in Morgan County commonly known as Jackson Lake. In order to drain the deeper parts of the reservoir a large ditch, about a mile long and one to eighteen feet deep, was constructed on a slight grade from the lowest level of the natural basin to the outlet. In June, 1911, this ditch had become so clogged by natural accumulations of sand, silt, weeds and other vegetable matter, that it would not draw off the water at the lower levels, and the company sought a means of overcoming the difficulty. The plaintiff in error, defendant below, the Stearns-Roger Manufacturing Company, was engaged in the manufacture and sale of machinery, with offices in the City and County of Denver.

The pleadings disclose a written contract between these parties of date July 3rd. 1911, containing an addendum. The manufacturing company, of the first part, agreed to furnish all material, labor, tools, and machinery in the installation of certain machinery and appliances, to be delivered at Goodrich station in Morgan County, Colorado, consisting of one six-inch Buffalo sand dredging pump, with suction piece therefor, complete, with jet connections, and necessary discharge pipe, to connect to an eight-inch line; one three-inch Buffalo Class "A" centrifugal pump, to be used as an auxiliary to supply the necessary jet water in the operation of the dredging pump; two hundred feet of eight-inch discharge pipe, with flexible connections, and necessary floats, for carrying same on the surface of the water; one wood

scow of exact dimensions to be determined by the engineering department of the first party; one twenty-five horsepower Weber gas engine complete, with necessary belting to make proper connections; fifteen hundred feet of three-eighths-inch wire rope, with clips and thimbles, and all necessary cast iron anchors for the purpose of anchoring the scow used in connection with the pumping plant. It further agreed to complete the pumping plant on or before September 3rd, 1911, except for specified causes of delay beyond its control, time being of the essence of the contract; and that the same have a guaranteed capacity of discharge of not less than one thousand gallons of water containing fifteen per cent. of solid matter per minute, raising the same to a height of not less than eighteen feet from the lower end of the suction pipe, to be demonstrated by a test made by the first party in operating the pumps, and maintaining such capacity for a period of three consecutive days, provided the solid substance remain in uniform consistency during the test, the plant not being guaranteed, however, to handle clay or gravel of greater size than one-half an inch in diameter. The third paragraph of the contract reads as follows:

"It is also agreed on the part of said party of the first part, that said party of the first part will and does guarantee that all of the equipment above specified shall be of first-class material throughout, and such as is best suited for the work for which said machinery is intended."

The reservoir company agreed to transport the machinery and appliances from the Goodrich station to some convenient place on the banks of Jackson Lake, and upon the final completion of the plant, and making of the tests specified, to pay therefor the sum of $3,200.

The addendum, made by the manufacturing company after the reservoir company had executed the agreement, was by the latter duly accepted as a part thereof.

The only matter contained therein of material bearing upon this controversy is the following:

"And it is further agreed and understood that this apparatus is in no wise guaranteed to operate on all kinds of material, such as clay substances, etc., but that the solid material is to be available for the pump in the form of loose sand, loose silt, and such similar substances."

August 29, 1911, the manufacturing company had installed the dredging plant, and commenced the test, the result of which was a complete failure so far as cleaning out the ditch be concerned. On September 5th, 1911, the reservoir company wrote plaintiff in error that the contract had not been performed by it, as to time, or design, and capability of machinery, and declared it rescinded. The following day plaintiff in error answered that communication to the effect that it was impossible to make the test specified in the contract because of local conditions, which were found not to be as represented, and that it had complied fully with the terms of the agreement, and demanded payment.

It appears that the apparatus was designed for operation under conditions permitting the metallic discharge pipe to be floated upon the surface of the water, and it could not be put to practical use in dredging this particular ditch because the channel was so narrow as to necessitate laying the discharge pipe on the ground. It further appears that because of weeds, thistles, and other vegetable matter being intermingled and embedded with sand and silt, in the channel of the ditch, it was impossible to complete the test required, as the vegetable matter would in the course of a few minutes of operation obstruct the suction pipe.

Witness Badger constructed a dredging plant which cleaned the ditch in the following year. His plant was equipped with a sixty horsepower engine, a six-inch flexible discharge pipe, of which the discharge end only was floated,

and a cutter-head, which latter was attached and propelled near the lower end of the suction pipe, and cut the weeds, thistles and other vegetable matter in such a way as to allow them to pass off with the sand and silt. However, competent testimony was adduced by the manufacturing company to show that its plant furnished ample power to propel a cutter-head at the mouth of the suction pipe, and that such an addition would have overcome the difficulty encountered at that point.

The reservoir company brought an action against the manufacturing company to recover the sum of $162.38, alleged to have been expended by it in connection with the work of installing the pumping plant, and to have the contract set aside and annulled. Plaintiff in error filed an answer and counter-claim, in the latter of which the contract was set out in full, with allegation of fulfillment of the terms thereof on its part, and praying judgment in the sum of $3,058, the principal sum designated in the contract, less certain deductions agreed upon by the parties after its execution. Issue was taken upon all new matter. A trial to the court resulted in a general finding that plaintiff did, and that defendant did not, substantially comply with the terms of the contract, judgment was accordingly rendered in favor of the reservoir company for the sum of $116.24, and cancelling and setting aside the contract. The manufacturing company brings the cause here for review on error.

The question is whether plaintiff in error simply contracted to furnish and install the specified articles of machinery of tested capacity, as it contends, or whether it contracted to furnish a dredging plant capable of cleaning out the ditch, as contended by the reservoir company. The written contract is not clear and definite on this proposition, and testimony was competent to aid in determining what the understanding and intention of the parties were, as disclosed by their actions, correspondence and statements.

At the trial the parties, without objection, freely submitted testimony tending to establish their respective versions of the contract.   There was ample evidence to support the findings of the trial court that it was agreed that plaintiff in error should furnish a plant that would clean out the ditch.   That was the thing to be accomplished, and it was for that purpose the reservoir company contracted to purchase the dredging plant.   The evidence shows conclusively that plaintiff in error failed to furnish a plant which would bring the desired result.   It was fatally defective in not having a cutter-head at the mouth of the suction pipe to dispose of the weeds, thistles, and other vegetable matter, and also in not having a flexible discharge pipe.   Undoubtedly these matters might have been remedied, but were not; indeed no offer was made to remedy them.   It seems clear, under the facts of this case, that no other conclusion than the one reached by the trial court was possible, and the judgment is therefore affirmed.

*Judgment affirmed.*

Chief Justice GABBERT and Mr. Justice WHITE concur.