No. 18,330.

RAY RYAN, ET AL., AS RYAN OIL COMPANY *v.*
FITZPATRICK DRILLING CO. INC.
(342 P. [2d] 1040)

Decided June 22, 1959.

Mr. WARREN E. ROBERTS, for plaintiffs in error.

Mr. JAMES J. DELANEY, Miss MARY JOHNSTON, for defendant in error.

*En Banc.*

MR. JUSTICE DOYLE delivered the opinion of the Court.

PLAINTIFFS in error, defendants in the district court, seek reversal of a judgment awarding the sum of $10,751.57 to the defendant in error who will be herein referred to as plaintiff.

Basically the controversy revolves around a written contract whereby plaintiff, a drilling contractor, had undertaken to drill a test well for oil and gas on leasehold property of defendants in a field called Grass Creek, Hot Springs County, Wyoming. Under the terms of the contract, defendants agreed to drill the test well for the sum of $20,000.00 plus a one-fourth interest in the completed well. The contract also provided that in the event of success, the completion costs would be paid on the basis of plaintiff paying one-fourth and defendants paying three-fourths.

The objective of the parties was to reach the Curtis sand. The parol testimony established that they believed that this would be realized at a level of 3900 feet to 4100 feet. Contrary to their expectations, however, the object oil bearing sand did not appear until the drill-

ing had progressed to an underground level of 4775 feet. The cost of drilling from 4300 feet to 4775 feet is in question. Plaintiff takes the position that the drilling below 4300 feet was extra work which is to be compensated on the joint venture basis of one-fourth-three-fourths. Defendants contend that plaintiff had agreed to drill a well to the Curtis sand and that the "extra" drilling was not beyond that which was contemplated by the contract and embraced in the original contract price.

Prior to this transaction the parties had had satisfactory business relations for many years and had never before entered into a written contract. On this occasion a written agreement was proposed and was first drafted by the defendants. The plaintiff changed the document originally submitted, and this changed draft is in evidence. The modifications made by plaintiff were written into the contract which was then signed, and became the agreement of the parties. The controversial provision of the contract as originally written by defendants stipulated that:

"Contractor agrees to drill a well in the SW SW NE Sec. 6, 46 N, 98 W, Hot Springs County, Wyoming to a depth sufficient to fully test the Curtis sand with approximate total depth of 4300 feet."

This provision was changed by striking the word "fully" and also the words "with approximate." The words "or a" were substituted for the latter two so that the agreement as signed reads as follows:

"Contractor agrees to drill a well in the * * * Wyoming to a depth sufficient to test the Curtis sand or to a total depth of 4300 feet."

The meaning of another stipulation is in question. This pertains to the compensation for extras and provides:

"It is understood and agreed that after the Schlumberger electric log has been run the contractor's obligations have been fulfilled, (sic) and any work performed

after that will be borne 25% by the Contractor, 75% by the Operator."

The facts surrounding the entering of the contract were explored at the trial in order to ascertain the true intention of the parties, and for the purpose of resolving the conflict between the quoted provisions of the agreement. Jerry Ryan, who had represented the defendants in the transaction, testified that when he first approached Jack Fitzpatrick, who represented plaintiff, he told him that he had an option to take a lease subject to drilling a well, and that the well should be drilled to the Curtis sand "which I expected to encounter in 4,000 feet or thereabouts." They agreed upon a price of $20,000.00 plus a one quarter interest to Fitzpatrick. Ryan stated that in his "opinion" the $20,000.00 was to cover a test of the Curtis sand. " * * * we thought it to be around 4,000 feet." Ryan also said that the agreement was based on the assumption that the Curtis sand would be encountered at 4,000 feet, and that both the original draft and the final agreement provided the same thing, that is, that the well be drilled to the Curtis sand regardless of depth. However, Ryan also said that neither party contemplated that the Curtis sand would be lower than 4300 feet as an outside limit.

Both Ryan and Fitzpatrick were at the well location when the drilling had progressed to 4300 feet, and thereafter until the Curtis sand was reached. It was, of course, apparent that the hole would have been untested and inconsequential short of the Curtis sand. As it turned out, it was proved commercially valueless at that level also. All completion work was performed (pumps, heater treaters, etc., were applied), but the well was not a commercial producer and the hole was finally abandoned as a dry one.

The testimony of an expert was offered with respect to custom and usage. The witness, Robert E. White of the Continental Oil Company, testified that ordinarily drilling contracts provide a day rate for compensating

a contractor or driller for services not specifically provided in the agreement. He also testified that a fixed depth is generally set forth in the agreement, and that beyond this depth the day rates govern the contractor's compensation. At the level here involved White testified that the rate set forth in the contract, that is, $650.00 per day, is within the range of fair and reasonable compensation.

Extensive findings of fact and conclusions of law were made by the trial judge. On the issue of intention of the parties in entering the agreement, the court found:

"That thereafter the parties entered into a written agreement * * * by which the plaintiff agreed to drill the well 'to a depth sufficient to test the Curtis sand, or to a total depth of 4300 feet'; that the intent of the parties thereto was that, for consideration stated in said written agreement, the plaintiff was to drill said well to the Curtis sand, or to a maximum depth of 4300 feet, whichever was reached first.

" * * * that with the intent, knowledge and acquiescence of the defendant, the plaintiff extended the well to the Curtis sand at a total depth of 4775 feet; that the plaintiff's contractual obligation, under the written agreement and the $20,000.00 figure was completed when he drilled to 4300 feet; that said drilling below 4300 feet was in the nature of extra services and was necessary and incident to the completion of the well."

Judgment was entered based upon a finding that after all charges and credits for completion and post-completion work had been computed defendants still owed plaintiff a net amount of $216.16 on the contract (that is the $20,000.00 contract price) plus the sum of $1,053.44 (admittedly owed) for post-completion services, together with $9,428.07 for defendants' share of drilling below 4300 feet. The judgment was for $216.16 due on the original agreement and for $10,535.41 as defendants' three-fourths share of the extra drilling expenses, together with interest.

The case was remarkably well tried and is well briefed and presented in this Court. The testimony was straightforward, there being little, if any, conflict. The questions at the trial (and here also) involved construction of the contract itself in the light of the surrounding circumstances and the customs of the trade as shown by extrinsic testimony.

■ 1. We do not agree with counsel for defendants that the trial court erred in receiving parol evidence as to the circumstances which led to the execution of the contract in suit, nor that the court erred in receiving and considering testimony relative to the acts and conduct of the parties during and following the performance of the contract. Whether the parties intended that the well be drilled to the Curtis sand regardless of depth for the contract price was by no means clear. The agreement, Exhibit B, was not explicit on this point and can serve merely as a guide to the true intent. In one clause plaintiff was required to drill "to a depth sufficient to test the Curtis sand, *or* to a total depth of 4300 feet." This would be clear enough had the contract not provided in addition: "It is understood and agreed that after the Schlumberger electric log has been run the contractor's obligations have been fulfilled (sic) and any work performed after that will be borne 25% by the Contractor, and 75% by the Operator." This latter clause, although written by plaintiff, is now claimed by defendants and they contend that full effect to the exclusion of the depth clause should be given to them; that by doing so the contract is clear and unambiguous in meaning. We hold, however, that the depth provision must be also considered and as a consequence of considering both there is a conflict between the two clauses which fully justified the introduction of parol evidence consisting of the preliminary draft agreement, the preliminary conversations, and the subsequent acts and conduct, all for the purpose of discovering the intent of the parties with respect to the vital issue whether the contractor's obli-

gations were complete under the written contract at the 4300-foot level.

■ Where, as here, it is impossible to reconcile conflicting clauses of a contract, it is proper to receive extrinsic evidence for the purpose of determining the intent of the parties. *Stearns Rogers Co. v. Jackson Lake Co.*, 61 Colo. 403, 158 P. 137; *Schmelzer v. Condit*, 69 Colo. 405, 195 P. 323; *Hammond v. Caton*, 121 Colo. 7, 212 P. (2d) 845. In *Thornton, Oil and Gas*, Vol. II, Sec. 704, the author declares:

"When the contract is ambiguous in that it does not clearly show the intention of the parties to it as to the depth to which the well shall be drilled, parol evidence may be admitted that they orally agreed that it should be drilled to a specified depth."

■ Testimony of the custom and usage in the industry to fix a maximum depth in a drilling contract, in order to set a limit on the obligation of the driller under such contract, was properly admitted. It was represented to be a custom sufficiently general so that the parties could be said to have contracted with reference to it.

The relevancy of such evidence to show intent of parties to a contract is discussed in 20 Am. Jur. 311, Sec. 333, *Evidence*, which reads as follows:

" * * * The admission of evidence of a custom or usage is of even more frequent occurrence in actions ex contractu in order to ascertain the intention of the parties when such intention has not been fully expressed in the contract, to interpret otherwise indeterminate intentions and acts of the parties, or to show that the mode in which the contract has been performed is one customarily followed by others engaged in the same calling or trade."

The evidence as to the value of operating a drilling rig at the particular level also satisfied the requirements of the rule.

2. Although the "log" clause of the contract which

is relied upon by the defendants creates doubt as to what the parties intended, it does not warrant the conclusion (when weighed against the depth clause and the extrinsic evidence) that plaintiff was required to drill to the Curtis sand regardless of *its* depth. The several reasons for our conclusion are:

a. The presence in the contract of the 4300 feet drilling limit.

b. It was impossible to locate the Curtis sand beforehand, and though the parties assumed that it was at 3900 feet or 4,000 feet it was reasonable for the contractor to set an outside limit. Conceivably it could have been at a much greater depth than it turned out to be and this would have exposed the contractor to prohibitive expense.

c. The 4300-foot limitation contained in the "depth clause" was not inserted accidentally. Plaintiff had refused to accept the uncertain provision originally submitted to Ryan, and had insisted on an outside limit. This history furnishes strong evidence of ultimate intention.

d. The "depth" clause is reconcilable with the "log" clause whereas if full effect were to be given to the latter clause it would be impossible to give meaning to the clause which imposes the 4300-foot limitation. The "log" provision was written on the assumption (based on representations of Ryan) that the Curtis sand would be reached at 3900 or 4000 feet. Actually an electric log could have been run (in the discretion of Ryan's geologist) prior to the level of the Curtis sand. Thus, the superficial conflict is resolved once the extrinsic evidence is analyzed.

■ It follows that the trial court's finding that the clause "to a depth sufficient to test the Curtis sand, or to a total depth of 4300 feet" meant "to test the Curtis sand, or to a total depth of 4300 feet *whichever was reached first*" is correct. Therefore, the contract did not require plaintiff to drill below 4300 feet. Beyond that

level, plaintiff's services were being performed with the consent of the defendants on a quantum meruit basis.

Whether the provision of the contract for extra work is applied or the fair value of the services is the criterion, the monetary result would be the same. Beyond the scope of the contract, the plaintiff had a one-quarter interest in the venture. This made him an operator to the extent of his interest and the one-quarter-three-quarter ratio was a fair and equitable division.

A similar problem existed in *Parkford v. Union Drilling & Petroleum Co.,* 118 Cal. App. 538, 5 P. (2d) 440. There the contract was less explicit than the agreement in the case at bar. It provided for drilling "to the oil sand from which the nearest wells are now producing, which sand is located at an approximate depth of 4700 feet." The consideration to the driller was $20,000.00 and a 40% interest. The driller alleged that a new agreement was concluded when the drilling reached 4800 feet whereby the parties would divide the costs. The Court found that there was such an oral agreement, but also held that the plaintiff was entitled to recover on an implied contract and on this point said:

"The extension of the oil well 817 feet below the original anticipated depth which was specified in the written agreement is in the nature of extra services which were performed by the contractors. These services, having been performed with the knowledge and acquiescence of the owners of the property, created an obligation which entitles the defendants to reasonable compensation therefor. Where the terms of the original agreement are entirely fulfilled, and additional work is performed pursuant to a subsequent oral agreement or merely with the knowledge and acquiescence of the owner, the contractor is entitled to reasonable compensation therefor. 27 Cal. Jur. 208, §15; 9 C.J. 840, §180."

3. Defendants finally contend that no recovery should be allowed for time spent by plaintiff in detaching a core barrel which had become stuck at the level of 4740 feet.

Plaintiff argues that since the contract requires the driller "to furnish one core of sufficient length to test the Curtis sand at no cost to the operator" that the time spent (as shown by the invoice of Fitzpatrick, Exhibit C) between October 30 and November 5 during which no progress at all in drilling was made should be wholly charged to the driller.

Plaintiff's response is that he deducted actual coring time, which was 8½ hours, and claims that inasmuch as he became stuck below the 4300-foot level this time should be divided upon the joint venture or three-fourths-one-fourth basis. The district court's finding on this question reads as follows:

"8. That testimony was introduced to the effect that a substantial part of the expense of drilling below 4300 feet was due to plaintiff's drilling tools being 'stuck' in the well; no claim was made that such was due to the negligence of the plaintiff; that the time and money expended while plaintiff's tools were stuck was a normal incident to drilling and constituted a proper and legitimate part of drilling expense."

The evidence is obscure as to whether the drilling was still in progress when the incident occurred in the coring process. However, it does appear that after the core barrel was recovered the drilling progressed to 4775 feet. The authorities on behalf of the defendants, 2 *Thornton, Oil and Gas,* p. 1010, §714, and *Columbian Fuel Corporation v. Skidmore,* 308 Ky. 447, 214 S.W. (2d) 761, are not persuasive because they deal with footage contracts holding that costs incurred while stuck and while fishing for tools cannot be added to the footage price. We do not believe, however, under the evidence here that such expense should be the sole responsibility of the driller. Rather, we are inclined to hold, consistent with the view which we have taken that the work performed below 4300 feet was extra work and beyond the provisions of the contract, that the "stuck time" should be divided upon the joint venture

basis of three-fourths-one-fourth. It follows, therefore, that the finding of the trial judge on the question was correct.

Perceiving no error in the record, the judgment is affirmed.

MR. JUSTICE HALL dissents.

MR. JUSTICE DAY does not participate.